JOSÉ y GUILLERMO RUBERT ARMSTRONG y PEDRO JUAN BON-
NIN, peticionarios, *v.* TRIBUNAL DE CONTRIBUCIONES DE
PUERTO RICO, demandado; SOL LUIS DESCARTES, TESO-
RERO DE PUERTO RICO, interventor.

Número 283.

*Sometido:* 8 de septiembre de 1952.  *Resuelto:* 7 de noviembre de 1952.

*Cayetano Coll Cuchí* y *Víctor A. Coll*, abogados de los peticionarios; *Hon. Procurador General Víctor Gutiérrez Franqui* y *José A. Mayoral, Procurador General Auxiliar*, abogados del interventor, querellado en el pleito principal.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

El 23 de diciembre de 1947, por escritura de compraventa e hipoteca otorgada en San Juan, José Rubert Armstrong vendió a la corporación Everlasting Development Corporation un condominio proindiviso en una finca de 517.5179 cuerdas situada en el barrio Monacillos, de Río Piedras. (¹) Esta venta se efectuó por el precio de $64,000, de los cuales el vendedor recibió en el acto, de la corporación adquirente, la suma de $12,000. La diferencia de $51,200 se obligó a pagarla la compradora en cuatro plazos de $12,800 cada uno, los días 30 de junio y 31 de diciembre de 1948; 15 de enero y 15 de febrero de 1949, con intereses a razón del 2 por ciento anual pagaderos por mensualidades vencidas.

En garantía del precio aplazado, intereses, costas y gastos en caso de ejecución judicial, se constituyó por la compradora una primera hipoteca sobre el inmueble adquirido. En la misma escritura se convino que la deudora podía sustituir esta garantía hipotecaria por una garantía prendaria, en cuyo caso se liberaría la finca del gravamen hipotecario.

Tres días más tarde, en documento suscrito el 26 de diciembre de 1947, se otorgó, por la Everlasting Development Corporation, el señor Rubert y el Banco Crédito y Ahorro Ponceño, un documento titulado "Contrato de Prenda" en el cual la Everlasting Development Corporation manifiesta constituir prenda sobre la suma de $52,421 para garantizar el

---

(¹) Los mismos hechos aquí reseñados se admiten por estipulación en cuanto a los casos de los otros dos peticionarios Guillermo Rubert Armstrong y Pedro Juan Bonnin, especialmente en cuanto a las sumas envueltas en las tres ventas de los tres condominios, y en cuanto a las operaciones, términos y condiciones que rodearon las ventas.

principal de $51,200, más intereses, costas, gastos y honorarios de abogado en caso de ejecución judicial, cantidad "que la mencionada deudora ha depositado en el Banco Crédito y Ahorro Ponceño, sucursal de San Juan, manifestando don Roberto Villanueva, en representación de dicho banco, haber recibido dicha cantidad con obligación de conservarla y retenerla en garantía del pago total de la obligación de la Everlasting Corporation."

Se obligó en el mismo documento el Banco Crédito y Ahorro Ponceño a no restituir la prenda total o parcialmente a la corporación deudora a menos que se le acreditara el pago total o parcial, según fuere el caso, de la obligación contraída por ésta con don José Ángel Rubert. Por lo demás, se acordaron en el contrato las condiciones para la redención de la prenda para su ejecución en caso de incumplimiento de parte de la corporación deudora.

En escritura otorgada en igual fecha, convinieron las partes cancelar la hipoteca antes constituída.

En el año 1948, a la fecha del vencimiento de los plazos diferidos en el precio del contrato de compraventa, la corporación compradora pagó a los peticionarios el total de ambos plazos de dicho año, a saber: el vencido el día 30 de junio de 1948, y el vencido el día 31 de diciembre de 1948, en un cheque, en ambos casos, de la dicha corporación, contra el Banco Crédito y Ahorro Ponceño, cuyos cheques fueron depositados por los querellantes en sus cuentas corrientes en el National City Bank of New York, Oficinas de San Juan, y debidamente solventados. Asimismo fueron pagados los plazos correspondientes al día 15 de enero de 1949 y al día 15 de febrero de 1949.

Los intereses convenidos entre la compradora y los vendedores por los plazos diferidos fueron pagados a los vendedores por la compradora según lo estipulado en el contrato.

Los peticionarios declararon en sus planillas de 1948 y 1949 estos pagos, satisfaciendo por ellos la contribución de

ingresos correspondiente al beneficio realizado en dichos años.

El Negociado de Contribución de Ingresos del Departamento de Hacienda, al examinar las planillas de ingresos de los peticionarios por el año 1947, determinó que la venta del condominio de la finca San Patricio y Puerto Nuevo, en la forma antes dicha, fué una venta de contado y no una venta a plazos, y procedió a determinar una deficiencia en las planillas de los peticionarios de dicho año en la suma de $35,089.70, con más intereses, en el caso primero, $34,243.47 en el segundo, y $13,108.35 en el último.

Según se determinó por el Tribunal de Contribuciones, el costo de su condominio para cada uno de los aquí peticionarios fué de $7,727.76, y siendo el precio de venta de cada condominio $64,000, cada uno realizó una ganancia total en la operación de $56,272.24.

Como señala el Tribunal de Contribuciones:

"La controversia surge del hecho de que los contribuyentes, en el año 1947 informaron cada uno como ingreso proveniente de la ganancia capital habida en esta transacción solamente la cantidad de $11,254.46,[2] calculada a base del pago inicial en efectivo de $12,800 en proporción al precio de venta y al costo, mientras que el Tesorero sostiene que han debido incluir en sus declaraciones de ingresos para dicho año la totalidad de la ganancia obtenida por cada uno en la cantidad de $56,272.24. Las deficiencias[3] montan, sin los intereses, a $35,089.70 para el demandante José Rubert Armstrong, a $13,108.35 para Pedro J. Bonnin y a $34,243.47 para Guillermo Rubert Armstrong."

Vista la prueba y consideradas las cuestiones de derecho suscitadas, el Tribunal de Contribuciones dictó sentencia declarando sin lugar las demandas y en consecuencia sosteniendo las deficiencias determinadas por el Tesorero, según queda dicho, a cada uno de los aquí peticionarios.

---

[2] En la petición de *certiorari* se admite, y también lo señala el Tesorero. en su alegato, que la cantidad realmente informada en este concepto fué de $11,071.03. En sus planillas los peticionarios se acogieron al método de ventas a plazos ("installment sales. method").

[3] Las deficiencias varían debido a la diferencia en los otros ingresos de los tres peticionarios.

Los fundamentos de la sentencia dictada se agrupan en dos conclusiones distintas, la primera, "que en este caso no hubo una genuina operación a plazos o por pagos diferidos o aplazados a los efectos de las disposiciones del estatuto contributivo y de su reglamento." A este respecto, señala el tribunal lo siguiente:

"Esta conclusión no implica la más leve imputación de fraude por parte de los contribuyentes. Ni ocultaron la ganancia tributable ni manipularon para no hacerla aparecer. Sencillamente ellos creyeron que podían acogerse a disposiciones reglamentarias que les permitirían pagar la contribución sobre estas ganancias en distintos años, y a tal fin intentaron, mediante cierta modalidad, convertir una venta de contado a todos los fines prácticos en una venta a plazos o por precio aplazado a los efectos contributivos."

La segunda conclusión del Tribunal de Contribuciones es en el sentido de que aunque se hubiese realizado una genuina transacción a plazos o en pagos aplazados, la totalidad de la ganancia realizada sería igualmente tributable en el año 1947, por aplicación del artículo 84 del Reglamento núm. 1 de Contribución sobre Ingresos y del apartado (c) de la sección 5 de la Ley de Contribuciones sobre Ingresos que dispone "que la cantidad realizada en la venta...de propiedad, será la suma de cualesquiera cantidades de dinero recibidas más el justo valor de la propiedad en el mercado que no se pagare en efectivo." Entendió el Tribunal de Contribuciones que el crédito por el precio aplazado, adquirido por los peticionarios en la venta a la Everlasting, habida cuenta de la garantía prendaria (primero hipotecaria) que se constituyó, tenía un valor en el mercado de $51,200 (la suma de dólares depositados en prenda) lo cual, sumado a los $12,800 pagados en efectivo hacen un total de valor recibido de $64,000. Por lo tanto, la conclusión de dicho tribunal fué al efecto de que cada uno de los peticionarios realizó en el año contributivo de 1947, la totalidad de la ganancia de capital obtenida en la

venta, montante a $56,272.24, la cual debieron haber incluído en sus declaraciones sobre ingresos para dicho año.

Los peticionarios en el presente recurso de certiorari, interpuesto bajo las disposiciones de la ley orgánica del extinto Tribunal de Contribuciones, señalan que a su juicio el tribunal a quo cometió los siguientes errores:

"*a*—Al sostener el dicho Tribunal recurrido que la transacción realizada por los peticionarios con la Everlasting Development Corporation era una hecha expresamente para evadir el pago de las contribuciones del año 1947, y que dicha transacción no constituyó la genuina transacción a plazos o a pagos diferidos que contempla el Reglamento núm. 1 promulgado por el Tesorero de Puerto Rico en el año 1924 y la sección 5 de la Ley de Contribuciones.

"*b*—Al aplicar erróneamente los artículos 82, 83 y 84 del referido Reglamento del Tesorero de Puerto Rico a transacciones de esta índole."

En su alegato los peticionarios exponen lo siguiente:

"La razón que aparentemente no encontró el Tribunal de Contribuciones para realizar la venta en la forma en que se hizo, salta inmediatamente a la vista. Si los señores Rubert hubieran llevado a cabo la venta de contado, el negocio no hubiera sido aconsejable para ellos, puesto que el pago del impuesto, calculado sobre un solo año, casi absorbía totalmente los beneficios. Para poder llevar a cabo la transacción les era imperioso realizarla a plazos, tal y como les permitía la Ley y la política del Departamento de Hacienda establecida en el Reglamento. Esta razón nunca ha sido ocultada por los peticionarios, sino claramente expuesta por el Sr. José Rubert cuando declaró como testigo ante el Tribunal de Contribuciones. Indudablemente esta es una motivación legal y justa para haber hecho la venta a plazos en lugar de haberla hecho de contado.....

"No es posible calificar de artificiosa una operación que consta de documentos públicos y cuya veracidad no se discute. El querellante tenía el derecho de vender su propiedad en aquellas condiciones que le fueren más favorables, incluyendo el menor pago de contribuciones. Lo que el querellante no hubiera podido hacer era fraguar una transacción fraudulenta para evi-

tar el impuesto; pero está bien reconocido, y no vale la pena citar autoridad, que todo contribuyente puede hacer uso de los medios legales a su alcance a los fines de aligerar su carga contributiva, siempre y cuando que no acuda a ficciones o medios ilegales."

Dos cuestiones básicas se plantean en este caso con respecto al problema esencial de si los ingresos deben ser considerados como recibidos en su totalidad en el año 1947 o como distribuídos en años posteriores, a saber:

(1) Asumiendo que los peticionarios hayan actuado de acuerdo con la ley, si el hecho de que su propósito, admitido abiertamente por ellos, fué el de reducir el pago de contribuciones, implica la ineficacia de su plan de pago de la contribución en distintos plazos, con la correspondiente obligación de pagar la contribución como si la totalidad del ingreso proveniente de la venta se hubiese recibido en el año 1947, y

(2) Si los peticionarios realmente actuaron de acuerdo con la ley.

El primer problema planteado puede examinarse a la luz de lo resuelto por la Corte Suprema de los Estados Unidos en el caso de *Gregory* v. *Helvering*, 293 U. S. 465. En ese caso, la contribuyente era la única dueña de todas las acciones de la corporación *A*, la cual corporación, a su vez, era dueña de mil acciones en la corporación *B*. La contribuyente deseaba ser dueña personalmente de esas acciones en la corporación *B*, sin que la corporación *A* se las transfiriese directamente a ella en forma de dividendos sujetos a tributación. Para lograr ese propósito, organizó una nueva corporación *C*, siendo ella la única accionista en la nueva corporación. Tres días después de quedar ésta última organizada, la corporación *A* le transfirió a la *C* las mil acciones. Seis días más tarde se disolvió la corporación *C* y en la liquidación de su activo la contribuyente obtuvo personalmente las mil acciones. Ese fué el único negocio hecho y la única actividad realizada por la corporación *C*. La sección 112 de la Ley Federal de Contribuciones Sobre Ingresos de 1928 disponía, en parte, que una

distribución de acciones a un accionista, a tono con un plan de reorganización, no era tributable como ganancia, y la misma sección disponía que una reorganización significaba, en parte, una transferencia del activo de una corporación a otra, si inmediatamente después de la transferencia la corporación cedente o sus accionistas o ambos tenían el control de la segunda corporación. Se dijo en la opinión lo siguiente, a la pág. 468:

"Se alega vigorosamente por la contribuyente que en vista de que ella cumplió con todos los requisitos de la subdivisión (B), se había llevado a cabo una reorganización estatutaria, y que el motivo de la contribuyente, al así hacerlo, de escapar el pago de la contribución no debe alterar el resultado o convertir en ilegal lo que el estatuto permitía. Es cierto que, si en realidad se efectuó una reorganización dentro del significado de la subdivisión (B), el propósito ulterior ya mencionado debe ser desatendido. Es indudable que un contribuyente tiene el derecho legal a reducir la cantidad de contribuciones que tendría que pagar, o a no pagar ninguna contribución, si los medios que él usa están permitidos por la ley. *United States* v. *Isham,* 17 Wall. 496, 506; *Superior Oil Co.* v. *Mississippi,* 280 U.S. 390, 395-6; *Jones* v. *Helvering,* 71 F.2d 214, 217. Pero la cuestión a ser determinada es si lo que se hizo, independientemente del motivo contributivo, era lo que estaba cubierto por la intención del estatuto . . . Cuando la subdivisión (B) habla de una transferencia del activo de una corporación a otra, ella significa una transferencia hecha "a tono o en el curso de llevar a cabo un plan de reorganización", y no una transferencia de activo por una corporación a otra a tono con un plan que no tenga relación con el negocio de cualquiera de las dos corporaciones, como ocurre claramente en este caso. Dejando a un lado, por lo tanto, la cuestión del motivo contributivo, y fijando la naturaleza del procedimiento que se siguió a base de lo que ocurrió realmente, ¿qué es lo que encontramos? Sencillamente una operación que no tiene un propósito de negocio (*business purpose*) o corporativo, un mero plan o invento que se ha revestido de la forma de una reorganización corporativa como un disfraz para ocultar su verdadero carácter, cuyo único objeto era la consumación de un plan preconcebido, no de reorganizar un negocio o parte de él, sino transferir acciones corporativas a la peticionaria. No hay

duda de que se creó válidamente una nueva corporación pero esa corporación no era nada más que un artificio para lograr el fin descrito. Para ningún otro propósito fué que se le dió vida y no llevó a cabo ninguna otra función, de acuerdo con el plan previo. Una vez se ejercitó esa función limitada, inmediatamente se le dió muerte. Bajo esas circunstancias, los hechos hablan por sí mismos. Todo el procedimiento, aunque conducido de acuerdo con los términos de la subdivisión (B), era de hecho una transferencia elaborada y tortuosa con la máscara de una reorganización corporativa, y nada más. La regla que excluye la consideración del motivo de evitar la contribución no es pertinente a esta situación, porque la transacción, de su faz, está fuera de la intención clara del estatuto. El resolver lo contrario exaltaría el artificio sobre la realidad, y privaría a la disposición estatutaria aquí envuelta de todo propósito serio."

En este último caso la contribuyente cumplió literalmente con el estatuto, pero la Corte Suprema de los Estados Unidos frustró su propósito de evadir la contribución mediante un proceso de interpretación del estatuto, al efecto de que la ley exigía implícitamente que la reorganización fuese hecha con el propósito auténtico de llevar a cabo una reorganización genuina, dentro del curso ordinario de los negocios. Paul, *Studies in Federal Taxation*, "Restatement of Tax Avoidance", pág. 129. No había una justificación económica en lo relativo al negocio de la contribuyente, para tal reorganización. *Commissioner* v. *Smith*, 136 F.2d. 556, 559. Aunque es posible que el motivo de escapar el pago de contribuciones no afecte, por sí solo, la actuación, si los métodos usados son aquellos que realmente corresponden a la intención legislativa, no siempre es suficiente que se siga la letra del estatuto. La cuestión decisiva es si lo que se ha hecho es la cosa que la ley tenía por objeto, ya que el contribuyente tiene que colocarse dentro del campo de la intención legislativa. *Commissioner* v. *Riggs*, 78 F.2d 1004, 1005.

Sirviendo como contraste a lo resuelto en el caso de *Gregory*, en el caso posterior de *Chisholm* v. *Commissioner*, 79 F.2d 14, certiorari denegado en 296 U.S. 641, el contribuyente

y otras cuatro personas eran los dueños de la totalidad de las acciones de una corporación. Por varios meses, el contribuyente y su hermano habían estado discutiendo la conveniencia de formar una sociedad que se hiciera cargo de sus asuntos, ya que al hermano no le gustaban los negocios y deseaba viajar. Ellos formaron la sociedad, y con el propósito adicional de reducir el pago de contribuciones, ellos transfirieron a la sociedad sus acciones en la corporación. Posteriormente la sociedad vendió esas mismas acciones a otra corporación, y el ingreso tributable fué recibido por la sociedad y no por el contribuyente individualmente. La sociedad continúo haciendo negocios para los cuales fué formada y siguió comprando y vendiendo valores. En la opinión emitida por el Juez Learned Hand se distingue el caso de *Gregory* y se reafirma la doctrina que el motivo de evitar el pago de contribuciones, en sí, no establece responsabilidad si la transacción, desconectada de tal motivo, no la establecería. Se indica que la cuestión siempre consiste en determinar si la transacción bajo escudriñamiento es de hecho, y en sustancia, lo que aparenta ser en su forma. Se dice que "podemos asumir que el propósito es la piedra de toque, pero el propósito relevante es el que derrota o contradice la transacción aparente, no el propósito de escapar el pago de contribuciones que la aparente transacción, y no toda la transacción, podría llevar a cabo. En...el caso de *Gregory*...los incorporadores adoptaron la forma usual para crear corporaciones, pero su intención, o propósito, era meramente el de redactar y preparar unos papeles, y no el de crear una corporación auténtica. Ese fué el propósito que derrotó su exención, y no el propósito adjunto de escapar la contribución; este último propósito era legalmente neutral. Si ellos realmente hubiesen tenido la intención genuina de conducir un negocio a través de las dos compañías reorganizadas, ellos se hubieran podido escapar de cualquier otro plan que ellos hubiesen podido tener, ya sea de evitar contribuciones o de regenerar al mundo."

En el caso de *Chisholm* la sociedad era autética y permanente, siguió haciendo negocios y respondió a una norma de utilidad y conveniencia para el contribuyente, independientemente del motivo contributivo. El caso de *Gregory* se resolvió a base de la interpretación de un estatuto y el de *Chisholm* se resolvió a base de sus propios hechos especiales. Paul, ob. cit., pág. 142, *et seq.*

En el caso posterior de *Commissioner* v. *Tower*, 327 U. S. 280 (1946), la Corte Suprema de los Estados Unidos dice lo siguiente, en la página 288:

"El querellado alega que la resolución de la Corte de Contribuciones, al efecto de que él es responsable por la contribución sobre las ganancias de la sociedad es contrario al principio establecido hace mucho tiempo por esta Corte al efecto de que 'el derecho legal de un contribuyente de reducir la cantidad de sus contribuciones, o evitarlas totalmente, por medios que la ley permita, no se presta a dudas'. *Gregory* v. *Helvering*, 293 U.S. 465, 469. No rechazamos ese principio. Claramente sería aplicable, por ejemplo, a una situación donde un socio, a los fines de no pagar contribuciones futuras sobre las ganancias de la sociedad y para colocarse en un nivel más bajo de contribuciones sobre ingresos, vende su participación a un extraño, abandonando todo su control del negocio. Pero la situación es distinta cuando el contribuyente redacta un papel a los fines aparentes de vender su participación en la sociedad aun a un extraño, aunque realmente el contribuyente continúa controlando el negocio en la misma forma en que él lo hacía antes de la venta, y canaliza los ingresos a su esposa. Bajo esas circunstancias, la demostración al efecto de que el arreglo fué hecho con el propósito expreso de reducir el pago de contribuciones sencillamente le da una base adicional a la inferencia de que el esposo aún controla el ingreso proveniente de su interés en la sociedad, que no existe una verdadera sociedad y que las ganancias realmente pertenecen a él y que, por lo tanto, él es el que debe pagar el tributo, y no su esposa. El arreglo que estamos aquí considerando era de un tipo en virtud del cual la prueba de un motivo para reducir contribuciones le imprimió más fortaleza a la inferencia formulada por la Corte de Contribuciones al efecto de que la esposa realmente no era miembro

de la sociedad. Véase Paul, *Estudios sobre Contribuciones Federales*, segunda serie, págs. 293–300. El resolver lo contrario implicaría el ordenar a la Corte de Contribuciones el que cerrara sus ojos a las realidades envueltas en los planes de evitación de contribuciones."

En el caso de *Griffiths* v. *Commissioner*, 308 U. S. 355, se trataba de una venta a plazos. Se resuelve que un contribuyente no puede escapar o posponer la contribución sobre ganancias derivadas de una venta de sus acciones mediante la creación de una corporación formada con el propósito de servir como conducto o vendedora de tales acciones, estando la corporación totalmente controlada por él, cuando la corporación, como cuestión de forma, recibía de él una transferencia de las acciones, a su vez las vendía a un comprador, recibía el precio de venta y acordaba con el contribuyente el darle el dinero a él en plazos anuales. Se dijo lo siguiente, en la pág. 357:

"Los hechos dejan poco margen para una explicación legal. Griffiths tenía una reclamación contra Lay, basada en el fraude de este último, que, al pagarse, eliminaba la pérdida por la cual se le había concedido anteriormente a él una deducción contributiva. Si el pago de la reclamación se hubiese hecho a él directamente, y no a través de un conducto, no habría dudas de que tal pago constituiría un ingreso de él. Habiendo sido reconocida la reclamación por Lay . . . la ingeniosidad de un abogado inventó un arreglo técnicamente elegante, mediante el cual una intricada apariencia externa se le dió a una sencilla venta de Griffiths a Lay y a una entrega de dinero por Lay a Griffiths. Esa era le esencia del negocio para Griffiths y esa es la esencia del negocio para nosotros. No podemos reiterar demasiado que 'la ley de contribuciones no se ocupa tanto de los refinamientos del título como del dominio real sobre la propiedad sujeta a tributación—el beneficio real sobre el cual se paga la tributación'. *Corliss* v. *Bowers*, 281 U.S. 376, 378. Y no hay diferencia alguna envuelta si tal 'dominación' real puede ser ejercitada a través de una retención específica de un título legal o a través de la creación de un nuevo interés equitativo, pero controlado, o la conservación de un beneficio efectivo a través de

la interposición de una agencia subordinada. *Gergory* v. *Helvering*, supra. Como dijo esta Corte en *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613 'determinado resultado al final de un camino recto no es un resultado distinto porque se llegue a él a través de un camino tortuoso'. Las palabras legislativas no son inertes, y derivan su vitalidad de los propósitos obvios que ellas contemplan, especialmente en cuanto a las disposiciones en una ley de contribuciones que gobiernan las ventas a plazos, en la sección 44 de la Ley de Rentas Fiscales de 1932. No se puede escapar de contribuciones mediante 'arreglos y contratos anticipantes, no importa la forma hábil en que se han hecho,... en virtud de los cuales las frutas se atribuyen a un árbol distinto del árbol donde ellas crecieron.' *Lucas* v. *Earl*, 281 U.S. 111, 115. Lo que Lay dió, Griffiths recibió, y sobre eso tiene que imponerse una contribución."

Ha preocupado a las cortes y a los tratadistas el problema de ética que surge de esta situación, de un contribuyente que alega que ha cumplido con la ley y que, por lo tanto, sus actuaciones legales deben ser protegidas, aun si él ha actuado con el propósito de evitar o posponer el pago de contribuciones. *Du Pont* v. *Commissioner*, 118 F.2d 544. Se indica que los jueces deben mantener su objetividad en cuanto a este problema, sin resolver a base de prejuicios emocionales o principios abstractos de moralidad. Paul, ob. cit., págs. 74, 80. Sin embargo, la objetividad judicial no implica inconsciencia ni aislamiento en cuanto a las realidades externas. La neutralidad legal no significa incapacidad para reaccionar en cuanto a los principios fundamentales de equidad que deben gobernar, no sólo las relaciones entre los hombres, sino también las relaciones entre los ciudadanos y su gobierno. El juzgador debe ser objetivo, pero no amoral. Con respecto a este problema de evitación de contribuciones, el hecho de que exista un motivo de escapar de las contribuciones, por sí solo, posiblemente no justifique la imposición de la contribución, pero sí justifica el que la transacción sea escudriñada con cuidado especial, debiendo requerirse del contribuyente que descargue el peso de la prueba que sobre

él debe recaer, a los fines de demostrar que él ha cumplido estrictamente con el estatuto. *Morsman* v. *Commissioner*, 90 F.2d 18, 22; *Continental Oil Co.* v. *Jones*, 113 F.2d 557, 761; *Niles* v. *Milbourne*, 100 F.2d 723, 725; *Helvering* v. *Minnesota Tea Co.*, 89 F.2d 711, 713. Tales transacciones deben ser escudriñadas rigurosamente y deben ser interpretadas celosamente. Paul, ob. cit., pág. 107; *Tazewell Electric Light & Power Co.* v. *Strother*, 84 F.2d 327. En el caso de *Morsman* v. *Commissioner*, supra, la corte dijo (pág. 22):

"Cuando un contribuyente proclama abiertamente que su intención, por lo menos en parte, al tratar de crear un fideicomiso es la de evadir contribuciones, la corte debe examinar con cuidado especial las formas usadas por él para llevar a cabo su propósito; y si su ingeniosidad falla en cualquier punto, la corte no debe ayudarle resolviendo las dudas en su favor."

Consideremos las circunstancias de este caso a la luz de la ley y del reglamento correspondiente. Nuestra Ley de Contribuciones Sobre Ingresos fué aprobada el 16 de agosto de 1925, con carácter retroactivo al 1 de enero de 1924, y tal Ley núm. 74 de 1925 (pág. 401) sigue en gran parte, literal o sustancialmente, el lenguaje de su prototipo, la Ley Federal de Rentas de 1924. *Behn* v. *Domenech, Tesorero*, 49 D.P.R. 808, 811. La sección 5 (*c*) de nuestra ley dispone lo siguiente:

"La cantidad realizada en la venta o cualquier otra disposición que se hiciere de la propiedad, será la suma de cualesquiera cantidades de dinero recibidas más el justo valor de la propiedad en el mercado." (4)

Nuestra sección 5 (*e*) dispone lo siguiente:

"Nada de lo contenido en esta sección deberá interpretarse en el sentido de evitar (en el caso de una propiedad vendida bajo

---

(4) Esta sección corresponde literalmente a la sección 202 (*c*) de la ley federal. Esta disposición fué reenactada en la ley federal de 1926, lo cual es relevante a la discusión de este caso, según veremos más adelante.

contrato para pagar a plazos) la contribución de aquella parte de cualquier plazo pagado, que represente ganancia o beneficio en el año en que dicho pago fuere recibido."[5]

Los artículos 82, 83 y 84 del Reglamento núm. 1 del Tesorero, para implementar la Ley núm. 74 de 1925, disponen lo siguiente:

"Artículo 82.—*Venta de bienes inmuebles con pagos diferidos.*

"Las ventas de bienes inmuebles con pagos diferidos de ordinario caen dentro de dos clases cuando se les considera con respecto a los términos de la venta, como sigue:

"(1) Transacciones a plazos, en que el pago inicial es relativamente bajo (generalmente menos de una cuarta parte del precio de venta) y los pagos diferidos usualmente pequeños y de cantidades reducidas. Estos incluyen (a) las ventas en que hay una transferencia inmediata del título cuando se hace un pago inicial pequeño, quedando el vendedor protegido por una hipoteca u otro gravamen en cuanto a los pagos diferidos, y (b) convenios de compraventa que contemplan el que el traspaso no se haga al principio, sino después de que todos o una parte sustancial de los plazos convenidos se haya pagado.

"(2) Las ventas con pago aplazado que no caen en el plan a plazos, en que hay un pago inicial sustancial (de ordinario no menos de una cuarta parte del precio de venta) garantizándose los pagos diferidos mediante hipoteca u otro gravamen. Tales ventas se distinguen de ventas a plazos por el carácter sustancial del pago inicial y también, usualmente, porque el número de pagos diferidos es relativamente pequeño.

[5] Esta sección corresponde a la sección 202(f) de la ley federal de 1921, que corresponde a la sección 202(e) de la ley federal del 1924. Antes del año 1921 no existía tal disposición en la ley federal. Posiblemente debido a esa omisión fué que la Junta de Apelaciones Contributivas (*Board of Tax Appeals*), resolvió que la parte del Reglamento federal, aprobado antes del 1921, que determinaba el procedimiento a seguir en casos de ventas a plazos, no estaba autorizada por la ley. Véase, *Appeal of B. B. Todd*, 1 B. T. A. 762. La sección 212(d) de la ley federal de 1926, que discutiremos más adelante, se aprobó con el fin de aclarar la situación creada por tal decisión de la Junta. Seidman, *Legislative History of Federal Income Tax Laws*, pág. 590; Mertens, *Laws of Federal Income Taxation*, Vol. 2, pág. 448, sec. 15.02; *Hoover-Bond Co. v. Denman*, 59 F.2d. 909; Magill, *Taxable Income*, pág. 213, edición revisada; 34 Ill. L. Rev. 599.

"Al determinar cómo deben tratarse estas clases al imponerse la contribución sobre ingresos, la cuestión en cada caso es si el ingreso a ser informado para fines de la contribución, debe basarse solamente en las cantidades de hecho recibidas en un año contributivo, o a base de toda la consideración establecida en los convenios para pagar en el futuro.

"Artículo 83.—*Venta de Bienes Inmuebles a Plazos*.—

"En las dos clases de transacciones incluídas en la clase (1) en el artículo precedente, las obligaciones a plazos asumidas por el comprador de ordinario no deben tratarse como que tienen un valor razonable en el mercado, y el vendedor puede informar como ingreso de tales transacciones en cualquier año aquella proporción de cada pago de hecho recibida en dicho año que el ingreso bruto a realizarse cuando la propiedad sea pagada pueda tener sobre el precio bruto del contrato. Si la planilla se hace sobre esta base y el vendedor reposee la propiedad por falta de pago del comprador, reteniendo los pagos anteriores, toda la cantidad de tales pagos, menos la ganancia anteriormente obtenida, serán ingresos del vendedor y así deberán informarse en la planilla para el año en que se reposeyó la propiedad, y ésta debe ser incluída en el inventario al costo original del vendedor (menos cualquier depreciación según ha sido ésta definida en los Artículos 128 y 129). Si el contribuyente opta como cuestión de práctica establecida consistentemente por tratar las obligaciones del comprador como que tienen un razonable valor en el mercado e informar el ingreso derivado de toda la consideración, pagos en efectivo y pagos a plazos, como ingreso para el año en que se hizo la venta, esto es permisible. De así tratarse, la regla prescrita en el Artículo 84 será aplicable.

"Artículo 84.—*Ventas de Bienes Inmuebles con Pagos Diferidos pero no a plazos*.—

"En la clase (2) del Artículo 82 las obligaciones asumidas por el comprador están mejor garantizadas debido al margen concedido por el sustancial primer pago, y la experiencia demuestra que la mayor parte de tales ventas son eventualmente cumplidas de acuerdo con sus términos. Si estas obligaciones tienen un valor razonable en el mercado, las mismas deben considerarse como el equivalente de dinero en efectivo y la propiedad obtenida de la transacción es ingreso tributable para el año en que el pago inicial se hizo y la obligación se asumió. Si el comprador no paga y el vendedor vuelve a obtener el título del terreno mediante convenio o procedimiento de ley y retiene

los pagos anteriormente hechos, puede deducir de su ingreso bruto como pérdida en el año de reposesión cualquier exceso de la cantidad anteriormente informada como ingreso sobre la cantidad de hecho recibida, y debe incluir tales bienes inmuebles en su inventario al costo original para él (menos cualquier depreciación según ésta se define en los artículos 128 y 129). Si las obligaciones no tienen ningún valor razonable en el mercado, la cantidad del pago inicial será aplicada en contra y reducirá la base, según se dispone en el Artículo 7 y en los Artículos 32–44, de la propiedad vendida, y si excede de tal base, será tributable en cuanto al exceso  La ganancia o la pérdida se consuma cuando las obligaciones son satisfechas o se dispone de las mismas, calculándose sobre la diferencia entre la base, según se provee anteriormente, y la cantidad obtenida por ellas. Véanse los Artículos 32 y 125."

Los peticionarios en este caso llevaban sus libros a base del sistema de contabilidad de "cobrado y pagado" (*cash basis*). Cf. *Buscaglia, Tes.* v. *Tribunal de Contribuciones*, 65 D.P.R. 353, 354. Independientemente de las disposiciones ya citadas referentes a ventas a plazos, el ingreso de un contribuyente que se acoja a tal método es tributable aun si no constituye dinero en efectivo. Es considerado como ingreso tributable en el año en que el contribuyente adquiere el poder absoluto de recibirlo, aunque no ejercite ese poder. Magill, *Taxable Income*, edición revisada, pág. 179; 39 Harv. L. Rev. 82, 83; *Loose* v. *United States*, 4 F. Supp. 375, confirmado en 74 F.2d 147. También constituye ingreso tributable si constituye el equivalente de dinero en efectivo, o sea, si el ingreso está representado por cualquier propiedad que tenga un justo valor en el mercado, tal como se reconoce, en cuanto a ventas, por la ya citada sección 5(c) de nuestra Ley de Contribuciones Sobre Ingresos. Cualquier obligación, que dé lugar a un derecho, que tenga un justo valor en el mercado, debe ser considerada como ingreso tributable, aun bajo el sistema de contabilidad de "cobrado y pagado" y tal obligación tiene un justo valor en el mercado cuando no es contingente ni especulativa ni depende de hechos inciertos, especialmente cuando es incondicional y está sujeta a riesgos mínimos.

2 Mertens, ob. cit. secciones 11.01 a 11.04, págs. 34–41, 49, y casos allí citados. Véanse, incidentalmente, *Burnet* v. *Logan*, 283 U.S. 404 y *Helvering* v. *Bruun*, 309 U.S. 461, 469, en donde se dice que una ganancia tributable derivada de una venta no tiene que ser en dinero en efectivo. Véase, además, 2 Mertens 191. El valor justo en el mercado es función de la adaptabilidad razonable de la propiedad a ser vendida. Cf. 18 Corn. L. Q. 564, 568. Estos principios son aplicables a una venta a plazos, considerada la transacción como una de pagos diferidos. 2 Mertens 41 et seq., sección 11.05.

La regla general, en ausencia de una disposición en contrario en un estatuto o reglamento, es al efecto de que debe aplicarse la doctrina de "equivalentes de dinero en efectivo" a una venta a plazos, esto es, generalmente, cuando el precio de venta está representado por dinero en efectivo y por propiedad que tenga un justo valor en el mercado, la totalidad de la ganancia debe ser reconocida en el año en que se efectúa la venta. 2 Mertens 41, sección 11.05. Sin embargo, se han establecido excepciones a tal regla por estatuto o por reglamento, al concedérsele una opción al contribuyente a los fines de que haga una venta a plazos en tal forma que su ingreso se distribuya en distintos años, pagando contribución en cada uno de los años en que reciba el pago de un plazo. 2 Mertens 41, 42. Según alega el contribuyente, esas excepciones están contenidas en las disposiciones ya citadas contenidas en la sección 5 (e) de nuestra ley y los artícuols 82, 83 y 84 del Reglamento núm. 1, que pasaremos ahora a examinar con relación a los hechos de este caso. Conviene señalar, en primer término, que aunque el propósito de tales disposiciones en cuanto a ventas a plazos es el concederle una ayuda o alivio al contribuyente, constituyendo ellas una excepción a la regla general, deben ser interpretadas estrictamente en contra del contribuyente, especialmente si tal método se usa con el fin de evadir contribuciones. 2 Mertens 447; *Blum's Inc.*, 17 B.T.A. 386.

La sección 5 (e) ya citada reconoce implícitamente el método de informar ingresos a base de venta a plazos pero no define la forma y manera en que se pueda usar tal método. Seidman, *Legislative History of Federal Income Tax Laws*, 590. Tal definición se formula por los artículos 82, 83 y 84 del Reglamento núm. 1 del Tesorero.

Como hemos visto, el artículo 82 del Reglamento define lo que constituye una venta a plazos, (1) cuando el pago inicial es pequeño, "*generalmente* menos de una cuarta parte del precio de venta", incluyendo ventas en que el vendedor es protegido por una hipoteca u otro gravamen en cuanto a los pagos diferidos, y se distingue tal transacción de (2) una venta con pagos diferidos, en que el pago inicial es sustancial, "*de ordinario* no menos de una cuarta parte del precio de venta", estando garantizados los pagos diferidos con hipoteca u otro gravamen. (Bastardillas nuestras.)

El artículo 83 dispone que en el caso de ventas a plazos, cuando generalmente el pago inicial es menor de una cuarta parte del precio total, las obligaciones asumidas por el comprador en cuanto al pago de los plazos no se deben considerar, *ordinariamente* como teniendo un justo valor en el mercado, y el vendedor puede informar su ingreso en los distintos años cuando recibe los pagos de los plazos.

El artículo 84 dispone que, en caso de pagos diferidos, cuando el vendedor ordinariamente recibe un pago inicial de más de la cuarta parte del precio total, el vendedor está mejor garantizado debido al primer pago sustancial, y se dispone que en ese caso, si las obligaciones tienen un valor justo en el mercado, ellas deben ser consideradas como el equivalente de dinero en efectivo y la contribución sobre la ganancia total debe imponerse en el año en que se recibe el pago inicial.

Tales disposiciones del Reglamento no son mandatorias, rígidas ni categóricas. Son meramente directivas. Establecen un margen de flexibilidad al indicar que son aplicables a situaciones ordinarias o generales. Esa generalidad per-

mite la aplicación de normas distintas en un caso cuyas circunstancias no sean ordinarias.

En *Ralston Steel Car Co.* v. *Commissioner of Internal Rev.*, 53 F.2d. 948, 950 se resuelve que el uso de la palabra "ordinariamente (*ordinarily*) en un Reglamento de contribuciones sobre ganancias indica flexibilidad en su aplicación, y no implica el establecimiento de una práctica que no permite desviación. *Cf. Stine* v. *Union Electric Co. of Illinois*, 26 N.E. 2d 433, 435, en donde se dice que "ordinariamente" no significa "realmente", o sea, que al usarse tal palabra en un estatuto ello implica que no hay que cumplir real y exactamente con los requisitos del estatuto. "Ordinariamente" quiere decir "usualmente". *St. Louis Southwestern Ry. Co. of Texas* v. *Morrow*, 93 S.W. 162.

Precisamente, el reglamento no puede establecer categorías rígidas e inflexibles en cuanto a las ventas a plazos o las ventas con pagos diferidos, a base de un percentaje específico del precio total de venta como frontera o punto de distinción que dé lugar a distintas consecuencias legales. La sección 5(e) de nuestra ley permite, en términos generales, el método de ventas a plazos, pero no especifica ni define distintas clases de situaciones. Cf., en cuanto a validez de reglamentos, *Descartes, Tes.* v. *Tribl. Contribuciones y Sucn. Serrallés*, 71 D.P.R. 471, 476.(⁶)

---

(⁶) La ley federal es categórica y específica en cuanto a este punto. En el año 1926 se aprobó la sección 212(d), que dispone que en el caso de ventas de bienes inmuebles, si el pago inicial no excede de una cuarta parte del precio total, el contribuyente tiene derecho a acogerse al plan de ventas a plazos. Se dice expresamente lo siguiente:

"Tal como se usa en esta subdivisión, el término 'pago inicial' significa pagos hechos en dinero en efectivo o propiedad que no sea evidencia de deudas del comprador (*evidence of indebtedness*)."

Ello se ha interpretado como un mandato específico, y cualquier venta en que el pago inicial sea menor del porcentaje fijado en la ley está cubierta por el sistema de ventas a plazos. 2 Mertens 474 *et seq.* Debe observarse, en cuanto a la exclusión expresa de "evidencia de deudas" como parte del precio, que antes de aprobarse esta enmienda en el 1926, la Junta de Apelaciones Contributivas había resuelto que pagarés del comprador en una venta debían considerarse como equivalentes de dinero en efectivo. *Appeal of H. J. Kelly*, 3 B.T.A. 257. Naturalmente, la regla

Como cuestión de hecho, la obligación de la compradora en el caso de autos de pagar el precio en distintos plazos tenía un valor justo en el mercado. Esa obligación estaba garantizada por una prenda de la totalidad del dinero adeudado, que se había depositado en un banco como garantía prendaria. La compradora no podía retirar ese dinero del banco. Los vendedores tenían el derecho absoluto de recibir el importe de los plazos en las fechas previamente acordadas o, en caso de no verificarse un pago, el acudir al dinero depositado en el banco. La obligación no era contingente ni especulativa ni dependía en hechos inciertos. Los vendedores estaban plenamente garantizados y no asumieron riesgos de clase alguna en cuanto al pago de los plazos. Como cuestión real, ellos controlaban el pago de los plazos. Ellos podían legalmente ceder o vender su crédito o derecho a los pagos conjuntamente con el derecho accesorio representado por la garantía prendaria. Artículos 1065 y 1417 del Código Civil; *Carlo* v. *Vargas*, 66 D.P.R. 407; *Caguas Company, Inc.* v. *López*, 59 D.P.R. 264; *Seín* v. *González et al.*, 26 D.P.R. 673. Es cierto que el tipo de interés, de un 2 por ciento, era bajo pero ello se debía a la seguridad casi absoluta del pago del crédito.

Aunque bajo el artículo 83 del Reglamento, las obligaciones de un comprador que haga un pago inicial de menos de la cuarta parte del precio total, ordinariamente no deben considerarse como teniendo un valor justo en el mercado, las circunstancias de este caso son tan poderosas en cuanto a la seguridad y ausencia de riesgos envueltos en el cobro de lo

era distinta después de la enmienda del 1926. *Estate of Plumer* v. *Commissioner*, 10 B.T.A. 1055, 1061–1062; *Brown & Coke Co.* v. *Commissioner*, 14 B.T.A. 609, 614. Tal sección de la ley federal no rige en Puerto Rico. De todos modos, aun bajo la ley federal, pagarés u obligaciones hipotecarias de terceras personas, y no del comprador, se consideran como equivalente de dinero en efectivo, por tener valor en el mercado, y deben ser consideradas como parte del pago inicial, a los fines del porcentaje correspondiente, dando ello lugar a una transacción de pagos diferidos, en que se concentra la contribución en el año de la venta, y no a una de ventas a plazos, en que se distribuyen las contribuciones. 2 Mertens 43, 478; *Caldwell* v. *United States*, 114 F.2d. 995

adeudado, que tenemos que llegar a la conclusión de que éste no es un caso ordinario y que la obligación de la compradora tenía un valor justo en el mercado y siendo, por lo tanto, equivalente a dinero en efectivo, debe computarse como parte del pago inicial a la luz de lo dispuesto por la sección 5(c) de nuestra ley.(7)

Se podría alegar que el artículo 83 del Reglamento, al disponer que de ordinario las obligaciones del comprador no tienen un valor justo en el mercado, establece una presunción en tal sentido. Independientemente de cualquier cuestión relativa al poder del Tesorero para establecer presunciones en el Reglamento, el peso de la prueba recae sobre los contribuyentes para evitar el pago de la contribución en un solo año, ya que, como hemos visto, ellos actuaron con el único motivo de evadir o posponer el pago de contribuciones. Este no es un caso "ordinario" que envuelva una situación "general". Se trata de un caso excepcional en que se efectuó un plan de ventas a plazos con el único motivo de pagar menos contribuciones. Según ya hemos indicado, los contribuyentes deben demostrar que han cumplido estrictamente con el estatuto.

Aun con anterioridad a la ley federal del año 1926 (véase escolio 6) los reglamentos federales establecían la distinción entre las dos distintas situaciones aquí envueltas a base de la cuantía del pago inicial. Tal como se dice en 2 Mertens 450, "la razón para establecer una distinción entre una venta en que hubiese habido un pago inicial cuantioso y una venta en que hubiese habido un pago inicial reducido surge claramente de esos reglamentos. Cuando el pago inicial era bastante grande se creyó que la obligación del comprador estaba mucho mejor garantizada debido al margen ofrecido por el primer pago sustancial. Esas obligaciones, por lo tanto, *po-*

---

(7) La sección 5(c) dispone que la cantidad realizada en una venta será el dinero recibido más el justo valor en el mercado de otra propiedad que no se pagare en efectivo. Las otras disposiciones relativas a ventas a plazos deben ser interpretadas conjuntamente con la sección 5(c), la cual debe ser aplicada en casos que no estén cubiertos por las disposiciones ya citadas del Reglamento. 34 Illinois L. Rev. 597, 601; 2 Mertens 452.

*dían* ser consideradas como el equivalente de dinero. La experiencia había demostrado, sin embargo, que cuando los pagos iniciales eran pequeños, las obligaciones estaban menos garantizadas y *de ordinario* no podían ser consideradas como el equivalente de dinero. (Bastardillas nuestras.)

Lo que estableció el reglamento fué una regla general y flexible a base de la experiencia usual. Empero, en un caso específico, como el de autos, en que las obligaciones del comprador están completamente garantizadas, y en el que el margen de seguridad del vendedor es casi absoluto, debe aplicarse aquella regla que corresponda a la realidad envuelta en ese caso específico, ya que ello corresponde al propósito envuelto en la disposición reglamentaria. Aun si la experiencia demostrase que, generalmente, no existe un margen adecuado de seguridad cuando el pago inicial es reducido, sin embargo, si contrario a esa experiencia previa en un caso determinado existe un margen de completa seguridad, aunque el pago inicial sea pequeño, entonces las obligaciones del comprador pueden ser consideradas como el equivalente de dinero. Como hemos visto el reglamento no exige, en forma mandatoria, que en todos los casos en que haya un pago inicial de menos de una cuarta parte del precio de venta, la transacción deba ser considerada como una venta a plazos. La flexibilidad expresada en el reglamento es compatible con la posibilidad de que haya un caso en que no se aplique la regla general expuesta en tales disposiciones reglamentarias, especialmente en aquellos casos en que el margen de seguridad del vendedor sea casi invulnerable.

Aunque no es exactamente aplicable a las circunstancias de este caso, en la opinión emitida por la Corte Suprema de los Estados Unidos en el caso de *Higgins* v. *Smith*, 308 U.S. 473, 477, se indica, en parte, lo siguiente:

"... Al gobierno no se le debe requerir que acepte la elección de un contribuyente en cuanto a la forma de hacer negocios que sea más ventajosa para el contribuyente. El gobierno puede observar las realidades, y al comprobar que la forma

usada para hacer negocios es irreal o espúria, el gobierno puede aceptar o ignorar el efecto de la ficción de acuerdo con lo que sirva mejor el propósito de la ley de contribuciones. El resolver lo contrario permitiría el que los planes de los contribuyentes sustituyan a la ley en cuanto a la determinación de la fecha y la manera en que se deben pagar las contribuciones."

*Debe confirmarse la sentencia apelada.*