El Juez Asociado Sr. Belaval está conforme con el resultado.

El Juez Asociado Sr. Sifre no intervino.

CARMEN CENTRALE, INC., querellante y apelante, *v.* SOL LUIS DESCARTES, EN SU CARÁCTER DE TESORERO DE PUERTO RICO, querellado y apelado.

Número 10836.

*Sometido:* 4 de mayo de 1953. *Resuelto:* 7 de agosto de 1953.

_____

*James R. Beverley, José López Baralt, Horacio Franceschi* y *Juan A. Faría,* abogados de la apelante; *Hon. Secretario de Justicia José Trías Monge* y *J. C. Santiago Matos, Procurador Auxiliar,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

En el año 1946, la corporación Carmen Centrale, Inc., aquí apelante, vendió 5,653 acciones que poseía de la corporación Finlay Bros. and Waymouth Trading Co., por el precio de $1,272,151.12, o sea, a base de $225.04 por cada acción. El Secretario de Hacienda de Puerto Rico notificó a la apelante, con respecto al mismo año 1946, una deficiencia de contribuciones sobre ingresos montante a $225,352.82, la cual surge, casi en su totalidad, de la determinación del Secretario de Hacienda al efecto de que en la venta mencionada de las acciones, verificada por la apelante en el año 1946, ella había obtenido un beneficio tributable de $494,082.52. Después de los procedimientos correspondientes, el anterior Tribunal de Contribuciones resolvió que, en efecto, la contribuyente apelante había obtenido un beneficio tributable como resultado de tal venta, pero que el beneficio había sido de $450,182.51. Carmen Centrale, Inc., ha apelado de esa sentencia para ante este Tribunal, y la con-

troversia ante nos se refiere a si, en virtud de las disposiciones pertinentes de nuestra Ley de Contribuciones sobre Ingresos, la apelante recibió o no tal beneficio tributable.

 Las acciones a que se refiere esta apelación provienen de un total de 5,853 acciones de la Finlay, adquiridas por la apelante, (o sea, la Carmen), de Manuel González el 13 de octubre de 1931. El valor señalado de esas acciones en cuanto a esa adquisición en el 1931 fué también de $225.04 por cada acción, y debido precisamente a ello es que la Carmen alega que no obtuvo beneficio tributable alguno al vender las acciones en el año 1946, exponiendo la contribuyente que ella compró las acciones a González en el 1931 por el mismo costo a que ella vendió en el 1946. De otro lado, el tribunal recurrido sostuvo que, bajo las secciones 5, 6 y 7 de la Ley de Contribuciones sobre Ingresos, la base que debe utilizarse para comprobar la existencia y la cuantía del beneficio tributable de la Carmen al vender en el 1946 no debe ser el costo o valor de las acciones al ser adquiridas de González en el 1931, sino lo que le habían costado esas acciones al cedente, o sea, a Manuel González, antes del 1931, esto es, antes de él transferirlas a la Carmen. Antes de iniciar la discusión del problema primordial que se ha sometido a nuestra consideración, se hace preciso el describir la transacción ocurrida entre la Carmen y Manuel González en el año 1931, ya que los términos y condiciones de esa adquisición constituyen el eje y nervio vital de la controversia.

Antes del año 1931, y en virtud de transacciones que describiremos en el curso de esta opinión, Manuel González era el dueño único e individual de la totalidad del activo y de las propiedades del negocio azucarero de la corporación azucarera Carmen Centrale, Inc., incluyendo todas las acciones de la Finlay a que hemos hecho referencia. Como dueño de tal activo, Manuel González también tenía deudas relacionadas con el mismo negocio de la Carmen, montantes a $2,647,035.80. El 13 de octubre de 1931 Manuel González traspasó a la Carmen todo su activo (el de González) con

relación al mismo negocio azucarero de la Carmen, montante dicho activo a la suma de $2,677,035.80, incluyendo las acciones de la Finlay, a cambio de $28,500 en acciones de la Carmen, $1,500 en efectivo y a cambio, además, de la creación de la obligación de la Carmen de asumir las deudas de González ya mencionadas, o sea, la Carmen asumió la obligación de pagar esas deudas montantes, como hemos visto, a $2,647,035.80. Como resultado de esa operación Manuel González obtuvo el control del 95 por ciento de las acciones de la Carmen.

La sección 5(a) de la Ley de Contribuciones sobre Ingresos, a la que nos referiremos en adelante como "la ley", es aplicable a la venta de las acciones hecha en el 1946 por la Carmen, cuya venta motivó la imposición de la deficiencia. Tal sección disponía lo siguiente:

"Excepto lo que más adelante se provee en esta sección, la ganancia derivada de la venta u otra disposición de la propiedad, será el excedente de la cantidad realizada en dicha venta o disposición, sobre la base que establece la subdivisión (a) o (b) de la sección 7, y la pérdida será el exceso de dicha base sobre la cantidad realizada."

Lo esencial en este caso consiste en determinar la base sobre la cual debe fijarse cualquier posible ganancia. Si la base fuese el costo o valor de las acciones adquiridas por la Carmen de Manuel González, en el 1931, entonces no habría exceso o ganancia tributable alguna, ya que el costo de las acciones en la transacción del 1931 coincide con el precio de venta de las acciones en el 1946. Pero si la base fuese el costo para Manuel González antes del 1931, entonces la situación sería distinta, y la sentencia del tribunal sería correcta. Veamos.

La sección 7(a)(8) de la ley es aplicable al caso de autos. En ella se dispone lo siguiente:

"Sección 7.—(a) La base para determinar la ganancia o pérdida derivada de la venta u otra disposición de la propiedad

adquirida despúes de febrero 28 de 1913, será el costo de dicha propiedad, con excepción de:

". . . . . . .

"(8) Si la propiedad (que nó sean acciones o valores en una corporación que sea parte de una reorganización) fué adquirida después de diciembre 31 de 1923, por una corporación mediante la emisión de sus acciones o valores en relación con una transacción descrita en el párrafo 4 de la subdivisión (b) de la sección 6 (incluyendo también aquellos casos donde parte del precio de la transferencia de dicha propiedad a la corporación fuere propiedad o dinero en adición a dichos valores o acciones), *entonces la base será la misma que lo fuera en poder del cedente,* aumentada por el importe de la ganancia o disminuída por el importe de la pérdida reconocida al cedente al realizarse dicha transferencia de acuerdo con la ley aplicable al año en el cual se hizo; . . ." (Bastardillas nuestras.)

El párrafo antes transcrito adopta por referencia la definición contenida en el párrafo 4 de la subdivisión (b) de la sección 6, cuyo párrafo dispone así:

"En la venta o permuta de propiedad la suma total de la ganancia o pérdida, determinada de acuerdo con la sección 5, será reconocida, *exceptuando* lo que más adelante se dispone en esta sección.

". . . . . . .

"(4) No será reconocida ganancia o pérdida alguna si se transfiriere propiedad a una corporación por una o más personas exclusivamente en permuta por acciones o valores de la corporación y si inmediatamente después de la permuta dicha persona o personas quedaren en control de la corporación; pero en el caso de una permuta hecha por dos o más personas este párrafo será aplicado solamente si el montante de las acciones o valores recibidos por cada una estuviere sustancialmente en proporción a su interés en la propiedad con anterioridad a la permuta." (Bastardillas nuestras.)

De ser aplicable la sección 7(a) (8), la base en cuanto a la venta de las acciones en el 1946 sería la misma que lo fuera en poder del cedente, o sea, en poder de Manuel González, considerado éste último como cedente de las acciones a la Carmen en el año 1931. De acuerdo con la sección 7(a)

la base para determinar la ganancia de una venta será, generalmente, el costo de la propiedad para la contribuyente vendedora, o sea, para la Carmen, en cuanto a la venta hecha en el 1946. Pero la propia sección 7(a) dispone: "exceptuando" lo dispuesto en varios párrafos subsiguientes, incluyendo el 7(a)(8), o sea, la sección 7(a)(8) establece una excepción al principio general, indicando que, bajo las circunstancias enumeradas en el párrafo (8), la base no será el costo de la propiedad para la contribuyente en la transacción objeto de la contribución, sino que la base será la misma que lo fuera en poder del cedente de la propiedad a la contribuyente, o sea, el costo de la propiedad para el cedente, la persona que originalmente cedió la propiedad a la contribuyente, esto es, Manuel González en este caso. Mertens, *Law of Federal Income Taxation*, Vol. 3, pág. 359, capítulo 21.02; Cf. *Schweitzer & Conrad, Inc.*, 41 B.T.A. 533, 547. Véanse además los casos de *Birren & Son, Inc.*, v. *Commissioner of Internal Revenue*, 116 F.2d 718; *Symington & Son Inc.*, 35 B.T.A. 711; *Thompson Securities Corp.*, 33 B.T.A. 1011, 1020; *Lanova Corp.*, 17 Tax Court 1178, resuelto en el 1952, y citado en 26 U.S.C.A., sección 113, Suplemento de 1952.

Examinemos la aplicabilidad de la sección 7(a) (8). Las acciones en controversia no son de una corporación que esté en proceso de reorganización. Ellas fueron adquiridas después de diciembre 31 de 1923 por una corporación, la Carmen, mediante la emisión de sus acciones o valores. Con respecto a la referencia a la sección 6(b)(4), contenida en la sección 7(a)(8), Manuel González, en virtud de la transacción del 1931, quedó en control de la corporación y aunque Manuel González no transfirió propiedad a la Carmen "exclusivamente en permuta por acciones o valores de la corporación" (sección 6(b)(4)), sin embargo, la sección 7(a)(8), después de referirse a la transacción descrita en la sección 6(b)(4), sigue diciendo: "incluyendo también aquellos casos donde parte del precio de la transferencia de dicha

propiedad a la corporación fuere propiedad o dinero en adición a dichos valores o acciones". Ahora bien, parte del precio de la transferencia hecha en el 1931 por Manuel González a la Carmen fué la suma de $1,500 pagada en efectivo por la Carmen a Manuel González y, además, la obligación de la Carmen de asumir las deudas de González con relación al negocio traspasado. La obligación asumida por la Carmen de pagar las deudas de González era análoga al disfrute de una ganancia para González, y equivalía a la adquisición de propiedad por González, en sus relaciones con la Carmen. *United States* v. *Hendler*, 303 U.S. 564; *Old Colony Trust Co.* v. *Commissioner*, 279 U.S. 716; *United States* v. *Boston & Maine Ry.*, 279 U.S. 732; Eicholz: "Some Tax Risks in Assumption of Liability", 22 Corn. L. Q. 543; Surrey, "Assumption of Indebtedness in Tax Free Exchanges", 50 Yale L. J. 1, 5; *Brons Hotels Inc.*, 34 B.T.A. 376; *Walter F. Haass*, 37 B.T.A. 948; Prentice-Hall, 1953 *Federal Tax Service*, Vol. 1, sección 10,275; 3 Mertens, ob. cit., sección 20.107, pág. 307. La asunción de tal obligación constituía "propiedad o dinero" para González dentro del significado de la sección 7(a)(8), en tanto él adquirió un derecho personal contra la Carmen para que ésta pagase sus deudas, siendo tal derecho efectivo solamente entre las partes al contrato, esto es, entre González y la Carmen, y aun si la asunción de esa obligación no tuviera un justo valor en el mercado, como veremos más adelante, ni fuese efectiva en cuanto a los acreedores, por no haber ellos consentido al cambio en la personalidad de su deudor.

Ya hemos visto que, habiéndose cumplido con los requisitos de la sección 7(a)(8), entonces la base será el costo para el cedente original. Pero sigue disponiendo la sección 7(a)(8) que esa base será "aumentada por el importe de la *ganancia* o disminuída por el importe de la pérdida *reconocida al cedente* al realizarse dicha transferencia de acuerdo con la ley aplicable al año en el cual se hizo". (Bastardillas nuestras.) Esta última cláusula introduce el concepto de la

base reajustada, esto es, para comprobar cuál fué el beneficio tributable de la Carmen al vender las acciones en el 1946, ese beneficio tributable se determina por la diferencia entre el precio de venta en el 1946 y el costo original de las acciones para González, debiéndosele añadir a ese costo o base la cantidad que haya obtenido González como ganancia reconocida por la ley como tributable (a él) al vender las acciones a la Carmen en el 1931. La sección 6 se refiere a aquellas ganancias que, por disposición expresa de tal sección, no son reconocidas como tributables y están libres de contribución (*tax free exchanges*). Todas aquellas ganancias que no estén incluídas en las excepciones enumeradas en la sección 6 deben ser consideradas como tributables. Por ello, al disponer la sección 7(a)(8) que la base en poder del cedente debe ser aumentada por la ganancia reconocida a él por la ley, la cuestión de si el cedente había obtenido originalmente una ganancia tributable, reconocida a él como tributable, debe determinarse por lo dispuesto en la sección 6. Expresando en forma más concreta esos conceptos, en cuanto a su aplicabilidad al caso de autos, de las conclusiones sobre los hechos formuladas por el tribunal sentenciador y de la prueba presentada ante ese tribunal surge, como veremos más adelante, que cada acción de la Finlay le costó originalmente a González la suma de $145.404. Él vendió las acciones a la Carmen en el 1931 a razón de $225.04 cada una, obteniendo González una ganancia de $79.636 por acción. La Carmen vendió esas mismas acciones en el 1946 a razón de $225.04 por acción, o sea, por el mismo precio en que ella había comprado a González en el 1931. Si la base tributaria con respecto a la venta en el 1946 fuese el costo de las acciones para la Carmen en el 1931, ella no estaría obteniendo beneficio tributable alguno, ya que el precio de venta ($225.04) sería idéntico al precio en que ella compró en el 1931. Pero ya hemos visto que, bajo la sección 7(a)(8), la base en cuanto a la venta en el 1946 era, no el costo para la Carmen, sino el costo para el cedente Gonzá-

lez, o sea $145.404. Hasta ese punto, el beneficio tributable por acción de la Carmen en el 1946 sería medido por la diferencia entre $225.04, precio de venta, y $145.404, costo para González, esto es, $79.636. Pero el artículo 7(a)(8) no se detiene en ese punto, sino que sigue disponiendo que esa base de $145.404 debe ser aumentada por la ganancia obtenida por González de $79.636, siempre y cuando que esa ganancia hubiese sido considerada como tributable a González en el 1931 (bajo la sección 6). Si esa ganancia fuese tributable bajo la sección 6, entonces a la base de $145.404 habría que añadirle la suma de $79.636, produciéndose una base reajustada para la Carmen, la suma de $225.04, que coincidiría con el precio de venta, no habiendo obtenido entonces la Carmen beneficio tributable alguno. Pero si, de otro lado, bajo la sección 6, la ganancia obtenida por González en el 1931, aunque real, no hubiese sido reconocida como tributable, ella nó podría ser añadida a la base original de $145.404, y ésta quedaría en pie como base para la Carmen, obteniendo esta última entonces, en cuanto a la venta del 1946, un beneficio de $79.636 por acción. El resultado de todo ello sería que uno de los dos interesados tendría que pagar contribución sobre tal ganancia, González en el 1931 o la Carmen en el 1946. El pago de la contribución por uno exonera al otro, y la exoneración del uno conlleva el pago por el otro. Esa es precisamente la filosofía de las secciones 5, 6 y 7, tal como se indica en Mertens, ob. cit., Vol. 3, pág. 356, capítulo 21.01, al decir:

"La llave que abre la puerta al entendimiento en cuanto a estos problemas es la regla general al efecto de que tanto el contribuyente como el Comisionado mantienen la misma situación (*are to be kept whole*) no importa cuantas transacciones o enajenaciones hayan ocurrido. Al fin y al cabo la ganancia debe estar sujeta a contribución por lo menos en una ocasión, y solamente en una ocasión."

Tal como se indica en 3 *Tax Law Review* 351, nota 2, el propósito esencial de las disposiciones estatutarias en dis-

cusión es el de evitar una base aumentada cuando la propiedad fué adquirida originalmente en una enajenación no tributable de por sí. Ello nos lleva a concentrar nuestra atención en la caracterización del traspaso de Manuel González a la Carmen en el 1931, en cuanto a si la ganancia de González era tributable o no, bajo la sección 6 de la ley. La sección 6 (*a*) y especialmente la 6 (*d*) (1) son aplicables al caso de autos. Estas secciones disponen lo siguiente:

"Sección 6.— (*a*) En la venta o permuta de propiedad la suma total de la ganancia o pérdida, determinada de acuerdo con la sección 5, será reconocida, *exceptuando lo que más adelante se dispone en esta sección.*

"(*d*) (1) Si dentro de las disposiciones de los párrafos (1), (2) ó (4) de la subdivisión (*b*) hubiera lugar a una permuta, a no ser por el hecho de que la propiedad recibida en ese concepto consiste no sólo de propiedad, el recibo de la cual se permite por dichos párrafos sin reconocimiento de ganancia, sino de otra propiedad o dinero, entonces, se reconocerá al receptor la ganancia, si la hubiere, pero en cantidad que no exceda de la suma de dicho dinero *y del justo valor en el mercado, de la otra propiedad.* Este párrafo no será aplicable a la permuta de acciones o valores que hiciere una corporación, que fuere parte de una reorganización, por acciones o valores y otra propiedad o dinero a virtud del plan de reorganización." (Bastardillas nuestras.)

En otras palabras, a González, como receptor en el 1931 en el intercambio de "otra propiedad" (obligación de la Carmen de pagar sus deudas) y de dinero ($1,500), se le reconocería una ganancia en cuanto al justo valor en el mercado de la obligación de la Carmen de pagar sus deudas, pero si tal obligación no tuviese justo valor en el mercado, no se le reconocería ganancia alguna como tributable. Ahora bien, la asunción de esa obligación por la Carmen, aunque constituía propiedad para González, no tenía un justo valor en el mercado, por las siguientes razones:

(1) Las deudas de González no fueron efectivamente pagadas por la Carmen. Muchos de los casos en que se ha

resuelto que la asunción de una obligación de pagar deudas constituye una propiedad con un justo valor en el mercado son casos en que las deudas han sido pagadas como cuestión de hecho, o en que los acreedores han liberado expresamente de toda responsabilidad al deudor. Véase *United States* v. *Hendler*, supra, [1] distinguido posteriormente por el Juez Learned Hand en *Bickford's Inc.* v. *Helvering*, 98 F.2d 568, 569, a base de que en el caso de Hendler las deudas fueron pagadas en el año contributivo; *Stevenson Consolidated Oil Co.*, 23 B.T.A. 610; *United States* v. *Boston & M. R. Co.*, 279 U.S. 732; *Citizens Nat. Trust & Savings Bank* v. *Welch*, 27 A.F.T.R. 1123, confirmado en 119 F.2d 717; *Anheuser-Busch Inc.*, 40 B.T.A. 1100, 1108, confirmado en 115 F.2d 662.

(2) Las deudas asumidas en este caso no eran de carácter hipotecario y la obligación de pagar esas deudas no estaba debidamente garantizada, siendo distinto, por lo tanto, este caso a los de *Rubert* v. *Tribl. Contribuciones y Tes.*, 74 D.P.R. 51 y *Brons Hotels, Inc.*, supra, en que se dijo que tal obligación tenía un valor justo en el mercado por el hecho de estar garantizada.

(3) Aunque el derecho adquirido por González podía ser efectivo en poder de él exclusivamente contra la Carmen, respondiendo esta última a González personalmente al no cumplir su obligación de pagar las deudas, ese derecho era exclusivamente personal de González y, por lo tanto, aunque constituía propiedad personal de González, en sus relaciones

---

[1] En el caso citado de *United States* v. *Hendler* se trataba de una reorganización de dos corporaciones, en que una asumió *y pagó* las deudas de la otra. La esencia de la opinión es que la deuda de la Hendler quedó liberada absolutamente por el pago de ella. En vista de lo resuelto en el caso de *Hendler*, el Congreso de los Estados Unidos enmendó la ley federal de Contribuciones sobre Ingresos, adicionando la sección 112(*k*) al efecto de limitar la doctrina del caso de *Hendler* y disponer que la asunción de deudas no debe ser considerada como "propiedad o dinero" en varias situaciones enumeradas expresamente en el estatuto. 26 U.S.C.A. 112(*b*)(4, 5, 10); 3 Mertens, ob. cit., cap. 20.107, pág. 307; Prentice-Hall, ob. cit., sec. 10,275, tercer párrafo.

con la Carmen, no tenía un valor justo en el mercado, ya que no era efectivo en cuanto a terceros ni en cuanto a los acreedores de González, que no habían prestado su consentimiento a que la Carmen asumiera las obligaciones de González. El artículo 1159 del Código Civil([2]) dispone que no puede hacerse una novación que consista en la sustitución de un nuevo deudor en lugar del primitivo, sin el consentimiento del acreedor. Sin tal consentimiento el deudor no queda liberado en cuanto a los acreedores, y la sustitución no produce efecto alguno en cuanto a los acreedores. *Ríos Ovalle* v. *Rosaly*, 50 D.P.R. 682; *Bou* v. *Colorado*, 24 D.P.R. 135; Cf. *Dávila* v. *Torres*, 58 D.P.R. 881. Véanse además, 8(1) Manresa 776, 780 et seq., quinta edición revisada; Revista de Derecho Privado, Tomo 10, pág. 98: "Trasmisión de Obligaciones". No obstante, la asunción de las deudas por la Carmen creó un derecho personal de González contra la Carmen, aun si no hubo consentimiento de los acreedores, y, por lo tanto, aun si ese derecho no tenía un "justo valor en el mercado" por no ser efectivo en cuanto a terceros y en cuanto a los acreedores. En su sentencia del 12 de abril de 1945 (8(1) Manresa 291, quinta edición revisada) el Tribunal Supremo de España resolvió que al asumir un comprador el pago de las deudas del vendedor sin haber mediado la conformidad del acreedor se trata de "una promesa de liberación o asunción interna de deuda, que, a diferencia de la novación subjetiva determinante de la liberación del deudor primitivo, mantiene la relación existente entre éste y sus acreedores, a la vez que provoca el nacimiento de un nuevo vínculo entre el deudor originario y el deudor por subrogación, en virtud del cual este último queda ligado para con aquél, al pago de las deudas y a la posible resolución de la venta por

---

([2]) Naturalmente, los problemas contributivos deben resolverse a base de lo dispuesto en la ley correspondiente de contribuciones, y no a base del Código Civil. Pero al definir lo que constituye "propiedad" y la eficacia de transmisibilidad de esa propiedad, procede acudir colateralmente al derecho sustantivo, si la materia no ha sido cubierta por la Ley de Contribuciones sobre Ingresos.

incumplimiento de la obligación contraída". Ese dictamen. ha merecido el elogio de los comentaristas, por ser representativo de un criterio realista. Manresa, ob. cit., pág. 292, 293, 783, 788; en cuya última página se dice que, habiendo tal asunción de deudas sin el consentimiento del acreedor,. las relaciones entre el primero y segundo deudor siempre, tienen particulares efectos.

Todo ello explica y reconcilia la aparente dicotomía de resolver, en primer término, que la asunción de las deudas de González constituye "propiedad" de González a los fines de la aplicación de la sección 7 (a) (8), en cuanto a la determinación de que la base para la venta en el 1946 fué el costo. original para González en el 1931, y de resolver, en segundo término que esa "propiedad" no tiene un justo valor en el. mercado, a los fines de lo dispuesto en la sección 6 (d) (1), determinante que la ganancia reconocida como tributable será aquella que esté representada por una propiedad que tenga un justo valor en el mercado, hasta la cantidad envuelta en ese valor, esto es, que de no tener la propiedad un justo valor en el mercado, la adquisición de ella no será reconocida como ganancia tributable.

En síntesis, la asunción de las deudas de González por la Carmen, en el 1931, no era reconocida por la ley como ganancia tributable de Manuel González, y, como cuestión de hecho,. no se impuso contribución alguna sobre tal ganancia. Por lo tanto, la base para la venta en el 1946 es el costo original de las acciones para González, sin que tal base pueda ser aumentada por el importe de la ganancia de González en el 1931, porque esa ganancia no era tributable bajo la sección 6. No habiendo pagado Manuel González contribución alguna sobre tal ganancia, la Carmen debe pagarla. Actuó correctamente el tribunal sentenciador al llegar a esa conclusión, en cuanto a las acciones.

■ La apelante impugna la determinación hecha por el tribunal sentenciador en cuanto al costo original para González de las acciones ($145.404 por acción; $851,055.36,

por 5,853 acciones y $821,968.81 por las 5,653 acciones aquí envueltas, que fueron vendidas por la Carmen en el 1946). No existe controversia sobre el hecho de que, originalmente, las 5,853 acciones de Finlay Bros. & Waymouth Trading Co. fueron adquiridas en común proindiviso por Genaro Cautiño y Manuel González al precio de $100 por acción, o sea $585,300 en total. Formaban parte estas acciones de los activos de la corporación en proceso de disolución, Carmen Centrale, Inc., cuyas propiedades fueron adquiridas en la forma antes dicha por los señores González y Cautiño.

En 17 de agosto de 1931 Cautiño vendió a González toda su participación en los bienes adquiridos, según inventario al 30 de junio de 1931. En la escritura otorgada se expresó un precio total de $1,317,295.98, haciéndose constar que de eso, $912,473.48 correspondían a las 5,853 acciones de Finlay Bros. junto con 764 acciones de Northern Puerto Rico Railroad Co. En 30 de junio de 1931 se hizo un asiento en los libros de González y Cautiño ajustando las acciones de Finlay a $731,870.75.

Creemos que hizo bien el tribunal a quo, en descartar el referido ajuste en los libros de González y Cautiño, pues el problema del caso no es el de determinar el valor de las acciones en los libros sino el *costo* para González a través de las dos transacciones en que adquirió el derecho de propiedad sobre las 5,853 acciones.

De acuerdo con la prueba, el condominio de Cautiño (igual, originalmente, al de González) en cuanto al resto de los bienes vendidos a González, que, conjuntamente con las acciones de la Finlay, ascendían al precio total de $912,473.48, tuvo un valor o precio (tal condominio de Cautiño en cuanto a los demás bienes) de $354,068.12. Restando tal suma del precio total de $912,473.48, queda un remanente de $558,405.36, precio o costo para González del condominio que Cautiño le vendió a González sobre las acciones de la Finlay. Por su propio condominio sobre tales acciones González había pagado originalmente a la Carmen la suma de $292,650

(mitad de $585,300). Añadiendo, en cuanto a las acciones, esos $292,650, costo para González de su propio condominio a la suma de $558,405.36, costo para González del condominio de Cautiño, el costo total de las 5,853 acciones para González fué de $851,055.36, o sea, $145.04 por acción, que fué el costo correcto determinado por el tribunal sentenciador.

Ahora bien, el tribunal a quo ignoró, erróneamente, que para fijar la base reajustada de la venta hecha por la Carmen, había que aumentar, bajo la sección 7(a)(8), al costo original de las acciones para González, cualquier ganancia de González reconocida como tributable, en el 1931. Ya hemos visto que la ganancia derivada de la venta de las acciones no era reconocida como tributable. Pero González también obtuvo por la venta $1,500 en efectivo, que constituía ganancia tributable. Se hacía preciso el añadir parte de esos $1,500 a la base original, o sea, al costo total para González de las acciones. Habría que determinar qué parte de esa ganancia tributable de $1,500 podría ser imputable a las acciones finalmente vendidas por la Carmen, ya que González obtuvo esos $1,500, en parte, a cambio, no solamente de las acciones por él transferidas a la Carmen, sino a cambio del activo total del negocio de la Carmen transferido por él a la corporación, cuyo activo incluía esas acciones. Ello se logra estableciendo una proporción(³) entre el precio pagado por la Carmen a González por las 5,853 acciones y el precio del activo total, con relación a los $1,500, y luego reajustar el resultado con relación a las 5,653 acciones vendidas, lo que produciría una suma de $712.63, o sea, la parte de los $1,500 que debería ser añadida a la base original, esto es, al costo original para González de las 5,653 acciones, o sea, $821,968.81 más $712.63, elevándose entonces la base

---

(³) La operación sería:

$$\frac{5,853 \text{ acciones: } \$1,317,170.75}{\text{Activo Total: } \$2,677,635.80} \times \$1,500.00$$

El resultado dividido por 5,853 acciones para comprobar la suma por cada acción, multiplicándose esa última suma por 5,653 (acciones).

reajustada a la suma de $822,681.44, imponiéndose en esa forma la contribución sobre ingresos sobre la ganancia tributable de la Carmen al vender las acciones en el 1946, esto es, sobre la diferencia entre el precio de venta de las 5,653 acciones, de $1,272,151.12 y la base reajustada de $822,681.44, lo que da lugar a una ganancia tributable de $449,469.68, cuantía de la deficiencia, en lugar de la deficiencia de $450,182.31.

*Debe modificarse la sentencia apelada al efecto de fijar la suma de $449,469.68 como deficiencia o ganancia tributable de la apelante en el año 1946, y así modificada, debe confirmarse la sentencia.*

Los Jueces Asociados Sres. Marrero y Sifre no intervinieron.

EN MOCIÓN DE RECONSIDERACIÓN<br>28 de enero de 1954

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

Este caso envuelve la determinación de la ganancia tributable de la contribuyente Carmen Centrale, Inc., con respecto a la venta hecha por esa entidad de 5,653 acciones, poseídas por ella, de la corporación Finlay Bros. and Waymouth Trading Co. En nuestra opinión original resolvimos que la base para la comprobación de tal ganancia no era el costo para la Carmen de la compra hecha por ella de esas acciones a Manuel González, sino el costo anterior de las acciones para Manuel González, al haberlas adquirido originalmente. Anteriormente, 5,853 acciones de la Finlay habían sido adquiridas en común y proindiviso por Genaro Cautiño y Manuel González al precio de $100 por acción, o sea, $585,300 en total. El 17 de agosto de 1931 Cautiño vendió su condominio a González, en virtud de una escritura que identificaremos como la núm. 53, a cambio de que González asumiese el pago del pasivo u obligaciones del negocio azucarero de la Carmen, que había sido previamente adquirido por ambos.

En nuestra opinión original resolvimos que el costo para González del condominio de Cautiño en las acciones fué de $558,405.36, lo cual, añadido al costo original para González de su propio condominio en las acciones, de $292,650, producía un costo total de las acciones para González de $851,055.36. La Carmen solicita de este Tribunal que reconsidere su opinión y sentencia, basándose la moción de reconsideración en la alegación de que el costo para González del condominio de Cautiño no fué la suma de $558,405.36, sino la suma de $658,585.37. Para sostener su punto de vista, la contribuyente alega, en síntesis, lo siguiente:

Que el 30 de junio de 1931, o sea, antes de haberle Cautiño vendido a González, ambos condueños habían reajustado en sus libros el valor de las acciones de la Finlay, aumentando ese valor en un incremento adicional de $731,870.75. Ese incremento representaba ser un "surplus" acumulado de beneficios de la Finlay. Alega la contribuyente que ese incremento de $731,000 debe ser añadido al costo original de las acciones para ambos condueños, de $585,300, produciendo un costo total de $1,317,170.75, siendo la mitad de esa cifra la suma de $658,585.37, cuya suma alega la contribuyente fué el costo para González del condominio de Cautiño. Ahora bien, a los fines de la determinación de la base para la comprobación de la ganancia tributable, el factor esencial es el costo real de las acciones y no su valor intrínseco. Aunque el valor reajustado de las acciones haya sido el de $658,585.37, ello no implica que ese haya sido el costo de ellas para González, o sea, el precio que haya pagado González por ellas. Pero alega la contribuyente que de la escritura de venta de condominio de Cautiño a González (núm. 53 de 17 de agosto de 1931) y del inventario unido a esa escritura surge que ese valor fué realmente el costo para González. Examinemos esos documentos.

Cautiño le vendió a González su condominio en las propiedades de la Carmen, incluyendo su condominio en las acciones, el 17 de agosto de 1931, por escritura número 53,

después de haberse hecho el reajuste *en los libros del valor* de las acciones. Para esa fecha el activo total del negocio de la Carmen ascendía a $2,677,035.80, *incluyendo el valor aumentado de las acciones*. Las obligaciones ascendían a $2,634,291 o sea, una diferencia de activo sobre pasivo de aproximadamente $43,000. Entonces, en esa escritura 53, de Cautiño a González se dice:

(1) Que Cautiño vende su condominio de una mitad de todas las propiedades de la Carmen, incluyendo las 5,853 acciones de la Finlay, o sea, vende la mitad del activo.

(2) Que "verifícase esta compraventa por el precio de $1,317,295.98 que es la mitad de la cantidad a que en junio 30 de 1931, fecha a que se retrotraen los efectos de esta escritura, ascendía el pasivo contraído por los comparecientes en el negocio azucarero a que aquí se hace referencia, *según el balance que se deja unido a este documento* y . . . González . . . el comprador, retiene dicha suma para dedicarla al pago de dicho pasivo, que asume totalmente, a medida que vaya venciendo el de las cantidades que lo integran, comprometiéndose asimismo a pagar cualquier otra deuda y obligaciones en que se haya incurrido en el referido negocio hasta la fecha de este otorgamiento aunque tal deuda u obligación no aparezca en el pasivo que se deja unido a esta escritura. En el referido pasivo está incluída la cantidad que los comparecientes adeudan del precio aplazado en que adquirieron los bienes que fueron objeto del contrato de compraventa, evidenciada dicha suma por pagarés que están en circulación y el comprador se obliga y compromete a pagar dichos pagarés puntualmente a su vencimiento, etc."

Nótese aquí, antes de seguir adelante, que el precio de venta es la mitad de las obligaciones o pasivo, según el balance unido al documento. En ese balance así unido aparece el pasivo como $2,634,000 (mitad, $1,317,000) y aparece una partida como parte del pasivo que dice: "Finlay Bros. . . . $513,558.20." Esto quizás no sean las acciones, y sí las obligaciones de la Finlay, pero es *la única* refe-

rencia a Finlay en el balance y en los inventarios que se unen a la escritura 53.

Se sigue diciendo en la escritura que "el precio de la venta *se distribuye* entre los bienes vendidos en la siguiente forma:

"Partida A

| | | |
|---|---|---|
| (1) | Condominio en finca A | 350, 000. |
| (2) | En finca B | 100. |
| (3) | En finca C | 14, 800. |
| (4) | En finca D | 1, 400. |
| (5) | En finca E | 3, 000. |
| (6) | En finca F | 4, 500. |
| (7) | En finca G | 3, 600. |
| (8) | En finca H | 1, 500. |
| (9) | En créditos hipotecarios | 25, 922. 50" |

Hay un inventario que se une a la escritura 53 (Cautiño a González), pero en ese inventario no se hace referencia a esas fincas y créditos hipotecarios ni al valor de ellas, ni la escritura se refiere al inventario en cuanto a esas fincas y créditos. De todos modos, el precio total por el condominio de Cautiño en esas fincas y créditos, según se hace constar en la escritura, es de $404,822.50, de un total de $1,317,295.

La escritura contiene entonces una segunda partida B, que incluye las 5,853 acciones de la Finlay, pero *no se pone un precio específico por el condominio sobre esas acciones.* En esa partida B se le pone un precio global de $912,473.48 (1,317,295 menos la partida A de $404,822.50), a distintos bienes, que son: las 5,853 acciones, 764 acciones de otra corporación, la Northern, derechos de arrendamiento, franquicias, contratos con colonos sobre siembras y molienda de caña, plantaciones de caña, materiales y existencias en almacén, ganado vacuno y caballar, carretería, arados, y tractores, aperos y útiles de labranza, herramientas, vía fija y portátil, material rodante, mobiliario, romanas, puentes y desvíos, efectos de laboratorio y líneas telefónicas y cuentas y créditos a cobrar, "*según aparece del balance e*

*inventarios que se dejan unidos a esta escritura,* en la suma de $912,473.48."

El único problema envuelto en la moción de reconsideración se refiere a cuánto le costó a González comprarle el condominio en las acciones a Cautiño, esto es, el precio de las acciones entre Cautiño y González. La partida B en la escritura 53 dice que las acciones y otras propiedades tienen un precio de $912,473.48. En el inventario que se une a la escritura 53 no se mencionan las acciones, no se establece el precio de las acciones. Lo único que se menciona es el precio de las otras propiedades, en la partida B, $708,136.24. Lo que hizo el tribunal a quo, y lo que se hizo en la opinión de este Tribunal, fué reducir $708,136.24 del precio total de la Partida B (912, 473.43) y la diferencia es el precio de las acciones. Creemos que este fué el procedimiento correcto, a base de lo que surge de la propia escritura y el propio inventario. Pero alega la contribuyente que el verdadero precio de las acciones es el de $585,300 más los $731,000 del reajuste anterior. Pero, en primer término, ese no es el precio mencionado en la escritura y en el inventario. Ese "costo" del valor original más $731,000, fué mencionado, no en el inventario unido a la escritura entre González y Cautiño, sino en otro inventario unido a la escritura posterior entre González y la Carmen, al venderle González a la Carmen, esto es, una escritura distinta, en que no intervino Cautiño.

En segundo término, el incremento de $731,000 en el valor de las acciones se refiere al valor, pero no al precio real pagado por González por el condominio de Cautiño en las acciones. No es el costo, necesariamente. El precio surge exclusivamente de la escritura 53 entre Cautiño y González y del inventario unido a *esa* escritura, que es el precio indicado en la opinión.

Alega la contribuyente que los precios puestos en la escritura 53 eran para los fines del Registro de la Propiedad. En

primer término, el precio total mencionado en la escritura 53 es de $1,137,000, que representa ser la mitad del pasivo. Ese pasivo siempre había sido el mismo, aun bajo el reajuste anterior. De modo que ese precio total es invariable, a menos que los precios ficticios, asumiendo que lo sean, siempre hayan sido ficticios, empezando con la escritura del 1927 en que González y Cautiño compraron la Carmen, esto es, que los precios en la escritura del 1927 también lo hayan sido para fines del Registro de la Propiedad. Asumiendo que siempre eran ficticios, la contribuyente no demostró los precios reales en cuanto a las demás propiedades. Por lo tanto, nos tendríamos que atener a lo que surge de la escritura 53 en discusión. Además, los únicos bienes inscribibles son los indicados en la partida A, fincas y créditos hipotecarios. Las demás propiedades, excepto las acciones, en la partida B no son inscribibles. Por lo tanto, no puede decirse que el precio total de la partida B, vías, puentes, franquicias, etc. y las acciones, con un precio total igual a $912,473, haya sido fijado para fines del Registro.

*Debe declararse sin lugar la moción de reconsideración, y debe ratificarse nuestra sentencia del 7 de agosto de 1953.*

Los Jueces Asociados Sres. Marrero y Sifre no intervinieron.